# EXHIBIT 5

FILED
TARRANT COUNTY
4/13/2016 1:02:01 PM
THOMAS A. WILDER
DISTRICT CLERK

NO. _____017-284890-16_____

| | |
|---|---|
| EXXON MOBIL CORPORATION, | IN THE DISTRICT COURT OF |
| *Plaintiff,* | |
| v. | |
| CLAUDE EARL WALKER, Attorney General of the United States Virgin Islands, in his official capacity, COHEN MILSTEIN SELLERS & TOLL, PLLC, in its official capacity as designee, and LINDA SINGER, in her official capacity as designee, | TARRANT COUNTY, TEXAS |
| *Defendants.* | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION
## FOR DECLARATORY RELIEF

Plaintiff Exxon Mobil Corporation ("ExxonMobil"), a company with principal offices in the State of Texas, files this Original Petition for Declaratory Relief against Defendants Claude Earl Walker, Attorney General of the United States Virgin Islands; the law firm of Cohen Milstein Sellers & Toll, PLLC ("Cohen Milstein"), a Washington, D.C. law firm that purports to represent Attorney General Walker in a claimed "investigation" of ExxonMobil; and Linda Singer, a member of Cohen Milstein with apparent responsibility for conducting the "investigation." Defendants' actions violate ExxonMobil's constitutionally protected rights of freedom of speech, freedom from unreasonable searches and seizures, and due process of law and constitute the common law tort of abuse of process. In support of this petition, ExxonMobil would show the Court:

017-284890-16

## I.   DISCOVERY CONTROL PLAN

1.      Discovery shall be conducted under the Level 2 Discovery Control Plan of Rule 190.3 of the Texas Rules of Civil Procedure.  However, ExxonMobil reserves the right to request entry of an order establishing a Level 3 discovery control plan.  Plaintiff seeks only non-monetary relief.

## II.   INTRODUCTION

2.      Frustrated by the federal government's perceived inaction, a coalition of 20 state attorneys general announced their "collective efforts to deal with the problem of climate change" at a press conference, held on March 29, 2016, with former Vice President Al Gore as the featured speaker.  The attorneys general declared that they planned to "creatively" and "aggressively" use the powers of their respective offices on behalf of the coalition to force ExxonMobil[1] and other energy companies to comply with the coalition's preferred policy responses to climate change.  As their statements made unmistakably clear, the attorneys general press conference was a politically-motivated event, urged on by activists intolerant of contrary views.

3.      At that press conference, Defendant Walker, the Attorney General of the United States Virgin Islands, an unincorporated United States Territory where ExxonMobil has no business operations, staff, or assets, pledged to do something "transformational" to end "rel[iance] on fossil fuel," beginning with "an investigation into a company" that manufactures a "product" he believes is "destroying this earth."

4.      Attorney General Walker's "transformational" use of his office's powers includes the issuance of a subpoena, signed by a member of his staff, but mailed to

---

[1]    ExxonMobil was formed as a result of a merger between Exxon and Mobil on November 30, 1999. For ease of discussion, we refer to the predecessor entities as ExxonMobil throughout the Petition.

017-284890-16

ExxonMobil in Irving, Texas by Cohen Milstein, a Washington, D.C. law firm that touts itself as a "pioneer in plaintiff class action lawsuits" and "the most effective law firm in the United States for lawsuits with a strong social and political component."

5.    In line with his so-called "transformational" agenda, Attorney General Walker deployed his authority under the Territory's anti-racketeering statute, the Criminally Influenced and Corrupt Organizations Act ("CICO"), to issue the subpoena, and he identified as the statutory predicates "obtaining money by false pretenses" and conspiracy to do so.  According to the subpoena, ExxonMobil "misrepresent[ed] [its] knowledge of the likelihood that [its] products and activities have contributed and are continuing to contribute to Climate Change in order to defraud" the government and "consumers" in the Virgin Islands, giving rise to an alleged "civil violation" of CICO.

6.    Attorney General Walker's allegation amounts to little more than a weak pretext for an unlawful exercise of government power.  First, CICO's statute of limitations requires the occurrence of at least one predicate act of fraud within the last five years.[2]  For more than a decade, however, ExxonMobil has widely and publicly confirmed that it "recognize[s] that the risk of climate change and its potential impacts on society and ecosystems may prove to be significant."[3]

7.    Second, ExxonMobil has engaged in no conduct in the Virgin Islands that could give rise to a violation of Virgin Islands law.  ExxonMobil has no physical presence in the Virgin Islands; it owns no property, has no employees, and has conducted no business operations in the Virgin Islands in the last five years.

---

[2]    14 V.I.C. § 604(j)(2)(B).

[3]    Exxon Mobil Corp., *Corporate Citizenship in a Changing World* 10 (2002); *see also* Exxon Mobil Corp., *2006 Corporate Citizenship Report* 15 (2007) ("Because the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented.").

017-284890-16

8.      Third, no court in the Virgin Islands has jurisdiction over ExxonMobil, a New Jersey corporation with principal offices in the State of Texas.  In the absence of such jurisdiction over ExxonMobil, neither Attorney General Walker nor Cohen Milstein has a legal basis to press any claims or charges against ExxonMobil arising under the laws of the Virgin Islands.[4]

9.      In short, there is no *bona fide* basis for the Walker/Cohen Milstein subpoena, much less the reasonable suspicion required by the face of the very statute whose authority Attorney General Walker and Cohen Milstein have abused.[5]

10.     Defendants' dubious allegation unmasks this subpoena for what it is: a pretextual use of law enforcement power to deter ExxonMobil from participating in ongoing public deliberations about climate change and to fish through decades of ExxonMobil's documents with the hope of finding some ammunition to enhance Attorney General Walker's position in the policy debate.  Attorney General Walker and designees Cohen Milstein and Singer, acting in their official capacities, are abusing the power of government to chill and deter ExxonMobil from engaging in public discussions of policy issues related to climate change.  The Walker/Cohen Milstein subpoena and the abusive CICO investigation violate and continue to violate ExxonMobil's rights under the United States Constitution and the Texas Constitution.

---

[4]   It appears that mailing the Walker/Cohen Milstein subpoena to ExxonMobil in Texas constitutes yet another impropriety.  *See* 14 V.I.C. § 612(d)  ("When documentary material is demanded by subpoena [under CICO], the subpoena shall not contain any requirement that would be unreasonable or improper if contained in a subpoena duces tecum issued by a court in this Territory.");  *Virgin Islands* v. *Steinhauer*, No. ST-10-CR-F240, 2010 WL 7371550 (V.I. Super. 2010) ("One important limitation on state courts is that they lack the authority to issue compulsory process outside of their respective territorial jurisdictions.").

[5]   14 V.I.C. § 612(a) (authorizing subpoenas where attorney general "reasonably suspect[s]" a CICO violation).

017-284890-16

11.     This flagrant misuse of law enforcement power is further illustrated by Attorney General Walker's outsourcing of the Virgin Islands' "investigation" to Defendants Cohen Milstein and Singer, likely on a contingency-fee basis.  Walker's purported delegation to Cohen Milstein and Singer deprives ExxonMobil of due process of law and fundamental fairness.  For more than a decade, Cohen Milstein has pursued bitterly contested and contentious litigation in an unrelated lawsuit against ExxonMobil now pending in federal court in the District of Columbia, which could result in a substantial fee award if Cohen Milstein's client were to prevail.  That litigation record and Cohen Milstein's receipt of a $15 million contingency-fee payment from Attorney General Walker in another unrelated case raise substantial doubts about whether that firm should be permitted to serve as the "disinterested prosecutor" whose impartiality is demanded by law and expected by the public.

12.     Through their unlawful and concerted actions, Attorney General Walker, Cohen Milstein, and Singer, acting in their official capacities, have deprived and will continue to deprive ExxonMobil of its rights under the United States Constitution, the Texas Constitution, and common law.  As a result, ExxonMobil seeks a declaratory judgment stating that the issuance of the Walker/Cohen Milstein subpoena has violated and continues to violate ExxonMobil's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 48 U.S.C. § 1561, and Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution, and constitutes an abuse of process under common law.

### III.     PARTIES

13.     Plaintiff ExxonMobil is a public shareholder owned energy company incorporated in New Jersey with principal offices in the State of Texas.  ExxonMobil has

017-284890-16

no business operations or staff in the Virgin Islands and has not had any within the past five years.

14.     Defendant Claude Earl Walker is the Attorney General of the Virgin Islands and resides in the Virgin Islands.  He is sued in his official capacity.  Under Virgin Islands law, Attorney General Walker is the chief law enforcement officer for the Territory and is the head of the Virgin Islands Department of Justice.  Attorney General Walker's principal office is located at 34-38 Kronprindsens Gade, GERS Complex, 2nd Floor, St. Thomas, U.S. Virgin Islands, 00802.  Attorney General Walker may be served with a copy of the Original Petition and Citation by serving the Texas Secretary of State at P.O. Box 12079, Austin, Texas 78711-2079, as the agent for service because Attorney General Walker committed a tort in Texas and Attorney General Walker does not maintain a registered agent for service of process in Texas.

15.     Defendant Cohen Milstein is a law firm that promotes itself as "a pioneer in plaintiff class action lawsuits" and "[t]he most effective law firm in the United States for lawsuits with a strong social and political component."[6]  Its principal office is located at 1100 New York Avenue, N.W., Suite 500, West Tower, Washington, D.C. 20005. Cohen Milstein is sued in its official capacity as the designee for the Attorney General of the Virgin Islands in his investigation of ExxonMobil and the mailing of the Walker/Cohen Milstein subpoena to ExxonMobil in Texas.  Cohen Milstein may be served with a copy of the Original Petition and Citation by serving the Texas Secretary of State at P.O. Box 12079, Austin, Texas 78711-2079, as the agent for service because

---

[6]     Cohen Milstein, *About Us*, *available at* http://www.cohenmilstein.com/about.php (last visited Apr. 12, 2016).

017-284890-16

Cohen Milstein committed a tort in Texas and does not maintain a registered agent for service of process in Texas.

16.    Defendant Linda Singer is a partner at Cohen Milstein's office in Washington, D.C. and a non-resident of Texas, whose usual place of business is located at 1100 New York Avenue, N.W., Suite 500, West Tower, Washington, D.C. 20005. Singer has been designated "national counsel" by Attorney General Walker in connection with the investigation of ExxonMobil and is sued in her official capacity.  Singer may be served with a copy of the Original Petition and Citation by serving the Texas Secretary of State at P.O. Box 12079, Austin, Texas 78711-2079, as the agent for service because Singer committed a tort in Texas and but does not maintain a regular place of business in Texas or maintain a registered agent for service of process in Texas.

## IV.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this case, pursuant to Article V, section 8 of the Texas Constitution, and Sections 24.007 and 24.008 of the Texas Government Code, because Plaintiff seeks a declaration under Section 37.003 of the Texas Civil Practice and Remedies Code that Defendants have violated and continue to violate its rights under 42 U.S.C. § 1983 and the Texas Constitution and that Defendants' actions constitute an abuse of process.

18.    This Court has personal jurisdiction over Defendants, pursuant to Section 17.042(2) of the Texas Civil Practice and Remedies Code, because Defendants committed a tort, which is the subject of this suit, in whole or in part in Texas by mailing and causing to be mailed a subpoena to Plaintiff in Texas, which violated Plaintiff's rights under the United States Constitution, the Texas Constitution, and the common law.

017-284890-16

Defendants' past conduct, and any further effort to enforce the subpoena, has injured and will continue to injure Plaintiff in Texas.

19.    Venue for this case is proper in Tarrant County under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events giving rise to the claim occurred in Tarrant County.   Specifically, the Walker/Cohen Milstein subpoena purports to compel ExxonMobil to search and review substantial records stored or maintained in Tarrant County.

## V.    FACTS

**A.**    **The "Green" Coalition of Attorneys General Announce a Plan to Use Law Enforcement Tools to Achieve Political Goals**

20.    ExxonMobil received the Walker/Cohen Milstein subpoena on March 22, 2016.   Although the subpoena appears to have been signed by the Deputy Attorney General of Attorney General Walker's office on March 15, 2016, it arrived by mail a week later in an envelope postmarked Washington, D.C., with a return address for Cohen Milstein's law offices.   ExxonMobil's address in Texas was written by hand on the envelope containing the subpoena.[7]

21.    On March 29, 2016, a week after ExxonMobil received the subpoena, Attorney General Walker appeared and spoke at a New York City press conference dubbed "AGs United For Clean Power." Former Vice President Al Gore was the event's featured speaker, and attorneys general or staff members from over a dozen other states, the District of Columbia, and the Virgin Islands were in attendance.[8]

---

[7]    A true and correct copy of a redacted version of the subpoena is attached as Exhibit A and is incorporated by reference.

[8]    A transcript of the AGs United For Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-

017-284890-16

22.     The attorneys general, self-proclaimed as "the Green 20" (a reference to the number of participating attorneys general), explained that their mission was to "com[e] up with creative ways to enforce laws being flouted by the fossil fuel industry."[9] Expressing dissatisfaction with the "gridlock in Washington" regarding climate change legislation, the New York Attorney General said that the coalition had to work "creatively" and "aggressively."[10]  He announced that the assembled "group of state actors [intended] to send the message that [they were] prepared to step into this [legislative] breach."[11]  He continued:

> We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action. So today, we're sending a message that, at least some of us—actually a lot of us—in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.[12]

23.     Vice President Gore also cited perceived inaction by the federal government to justify investigations brought by state attorneys general, observing that "our democracy's been hacked . . . but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level."[13]

24.     Vice President Gore went on to condemn those who question the viability of renewable energy sources, faulting them for "slow[ing] down this renewable

---

attorneys-general-across.  A copy of this transcript is attached as Exhibit B and is incorporated by reference.
[9]  *Id.* at 2.
[10]  *Id.*
[11]  *Id.* at 3.
[12]  *Id.* at 4.
[13]  *Id.* at 9.

017-284890-16

revolution" by "trying to convince people that renewable energy is not a viable option."[14] He then accused the fossil fuel industry of "using [its] combined political and lobbying efforts to put taxes on solar panels and jigger with the laws" and said "[w]e do not have 40 years to continue suffering the consequences of the fraud."[15]

25.     After hailing Vice President Gore as one of his "heroes," Attorney General Walker explained that his office had "launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it."[16]   That thinly-veiled reference to ExxonMobil was later confirmed in a press release naming ExxonMobil as the target of his investigation.[17]

26.     Continuing the theme of the press conference, Attorney General Walker admitted that his investigation of ExxonMobil (or "Goliath," to use his vernacular) was aimed at changing public policy, not investigating actual violations of existing law:

> It could be David and Goliath, the Virgin Islands against a huge corporation, but we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational.   We cannot continue to rely on fossil fuel.   Vice President Gore has made that clear.[18]

27.     To Attorney General Walker, the public policy debate on climate change is settled: "We have to look at renewable energy.  That's the only solution."[19]

28.     As for the energy companies like ExxonMobil, Attorney General Walker accused them of producing a "product that is destroying this earth."[20]  He complained

---

[14]   *Id.*
[15]   *Id.* at 7.
[16]   *Id.* at 15.
[17]   Press Release, A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change (Mar. 29, 2016), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.
[18]   Ex. B at 16.
[19]   *Id.*

that, "as the polar caps melt," those "companies . . . are looking at that as an opportunity to go and drill, to go and get more oil.  Why?  How selfish can you be?"[21]

29.    These statements were so wholly incompatible with the impartiality expected of law enforcement officials that one reporter asked whether the press conference and the publicized investigations were nothing more than "publicity stunt[s]."[22]

30.    The press conference also drew a swift and sharp rebuke from other state attorneys general who recognized a misuse of state power in the making.  The attorneys general of Alabama and Oklahoma stated that "scientific and political debate" "should not be silenced with threats of criminal prosecution by those who believe that their position is the only correct one and that all dissenting voices must therefore be intimidated and coerced into silence."[23]  They stated further that "[i]t is inappropriate for State Attorneys General to use the power of their office to attempt to silence core political speech on one of the major policy debates of our time."[24]

31.    The Louisiana Attorney General observed that "[i]t is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[25]  Likewise, the Kansas Attorney General questioned the "unprecedented" and "strictly partisan nature of announcing state 'law enforcement' operations in the presence of a

---

[20]    *Id.*

[21]    *Id.*

[22]    *Id.* at 17.

[23]    Press Release, Alabama Attorney General, State AG's Strange, Pruitt Condemn Attempts To Silence Those Who Disagree With President Obama's Energy Agenda (March 30, 2016), *available at* http://www.ago.state.al.us/News-800.

[24]    *Id.*

[25]    *Attorney General Jeff Landry Slams Al Gore's Coalition*, Office of the Attorney General: State of Louisiana (Mar. 30, 2016), *available at* https://www.ag.state.la.us/Article.aspx?articleID=2207 &catID=2.

former vice president of the United State[s] who, presumably [as a private citizen], has no role in the enforcement of the 17 states' securities or consumer protection laws."[26] The West Virginia Attorney General criticized the attorneys general for "abusing the powers of their office" and stated that the desire to "eliminate fossil fuels . . . should not be driving any legal activity" and that it was improper to "use the power of the office of attorney general to silence . . . critics."[27]

**B.     The Virgin Islands Investigation of ExxonMobil Is Invalid and Meritless**

32.     Eight months before the press conference, on August 6, 2015, Kenneth Mapp, the Governor of the Virgin Islands, appointed Defendant Walker as the Acting Attorney General. Walker was confirmed in the office on December 15, 2015.

33.     The Attorney General of the Virgin Islands is authorized to (i) "investigate violations of the laws of the Virgin Islands for which the executive branch of the Government of the United States Virgin Islands may invoke penalties, fines or forfeitures, or deny, suspend or revoke licenses" and (ii) "initiate and conduct appropriate proceedings in relation thereto."[28]

34.     According to the Walker/Cohen Milstein subpoena, the Virgin Islands investigation concerns ExxonMobil's alleged violation of CICO, the Territory's version of the federal Racketeer Influenced and Corrupt Organizations Act.[29] The subpoena spans 17 pages, contains 16 broadly worded document requests, and covers a nearly 40-year time period. The subpoena identifies two purported predicate offenses: obtaining

---

[26]   Michael Bastasch, *Kansas AG Takes On Al Gore's Alarmism – Won't Join Anti-Exxon 'Publicity Stunt,'* Dailycaller.com (Apr. 4, 2016), *available at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

[27]   Kyle Feldscher, *West Virginia AG 'disappointed' in probes of Exxon Mobil*, Washington Examiner (Apr. 5, 2016), *available at* http://www.washingtonexaminer.com/west-virginia-ag-disappointed-in-probes-of-exxon-mobil/article/2587724.

[28]   3 V.I.C. § 114(4).

[29]   Ex. A at 1.

017-284890-16

money by false pretenses, in violation of 14 V.I.C. § 834, and conspiracy to obtain money by false pretenses, in violation of 14 V.I.C. § 551.[30]

35.    In order to issue a subpoena investigating an alleged CICO violation, the Attorney General must "reasonably suspect[]" that a CICO violation has occurred.[31]  But the grounds Attorney General Walker has identified for his suspicion are pretexts.

36.    Under CICO, at least one of the two required predicate acts must have been committed within five years of the filing of any case by the Attorney General.[32]  To meet the statutory standard of reasonable suspicion for an act within the limitations period, at a bare minimum, it would have to be shown that sometime after March 2011, ExxonMobil "misrepresent[ed] [its] knowledge of the likelihood that [its] products and activities have contributed and are continuing to contribute to Climate Change in order to defraud" the government and "consumers" in the Virgin Islands.[33]  But throughout that period and well before, ExxonMobil has publicly and repeatedly acknowledged risks related to climate change.

37.    For example, ExxonMobil's 2006 Corporate Citizenship Report recognized that "the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant."[34]   Despite noting that "[c]limate remains an extraordinarily complex area of scientific study," it reasoned that "strategies that address the risk need to be developed and implemented."[35]

---

[30]    *Id.*
[31]    14 V.I.C. § 612(a).
[32]    14 V.I.C. § 604(j)(2)(B).
[33]    Ex. A. at 1.
[34]    Exxon Mobil Corp., *2006 Corporate Citizenship Report* 15 (2007).
[35]    *Id.*

017-284890-16

38.      In addition, in 2002, ExxonMobil, along with three other companies, helped launch the Global Climate and Energy Project at Stanford University, which has a mission of "conducting fundamental research on technologies that will permit the development of global energy systems with significantly lower greenhouse gas emissions."[36]

39.      ExxonMobil has also discussed these risks in its public Securities and Exchange Commission filings.  For example, in its 2006 10-K, ExxonMobil stated that the "risks of global climate change" "have been, and may in the future" continue to impact its operations.[37]  Similarly, in its 2009 10-K, ExxonMobil noted that the "risk of climate change" and "pending greenhouse gas regulations" may increase its "compliance costs."[38]

40.      It is notable that the United States government did not even formally opine on the effects of greenhouse gases on the environment until 2009, when the Environmental Protection Agency ("EPA") issued its endangerment finding that "current and projected concentrations of the six key well-mixed greenhouse gases . . . in the atmosphere threaten the public health and welfare of current and future generations."[39]

41.      An even more fundamental problem with the investigation is that Attorney General Walker and the Territory of the Virgin Islands lack jurisdiction over ExxonMobil.  ExxonMobil has maintained no business operations, staff, or assets in the Virgin Islands within the last five years.  Rather, ExxonMobil is headquartered and

---

[36]  Stanford University Global Climate & Energy Project, *About Us, available at* https://gcep.stanford.edu/about/index.html (last visited Apr. 12, 2016).

[37]  Exxon Mobil Corp., Annual Report (Form 10-K) (Feb. 28, 2007).

[38]  Exxon Mobil Corp., Annual Report (Form 10-K) (Feb. 26, 2010).

[39]  *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, EPA, http://www3.epa.gov/climatechange/endangerment (last updated Feb. 23, 2016).

017-284890-16

maintains all of its central operations in Texas. There appears to be no legal action that Attorney General Walker could plausibly bring against ExxonMobil under CICO in a Virgin Islands court.

42.     Nevertheless, the Walker/Cohen Milstein subpoena unreasonably demands production of essentially any and all ExxonMobil communications and documents related to climate change since 1977 (a period of 39 years), including all documents related to research ExxonMobil conducted or funded.[40]   For example, the subpoena demands "[a]ll Documents or Communications reflecting or concerning studies, research, or other reviews" ExxonMobil conducted or funded "regarding the certainty, uncertainty, causes or impacts of Climate Change."[41]

43.     The subpoena also appears to target individuals and entities that hold policy views with which Attorney General Walker disagrees.  The subpoena requests "[a]ll Documents or Communications concerning research, advocacy, strategy, reports, studies, reviews, or public opinions regarding Climate Change sent to or received from" 88 named organizations, three-quarters of which have been identified by environmental advocacy groups as opposing policies in favor of addressing climate change or disputing the science in support of climate change.[42]    It requests similar documents and communications from 54 named scientists, professors, and other professionals.[43]  Eighty percent of the individuals in this request, who have been identified in the media as having a viewpoint on climate change, either oppose policies in favor of addressing climate change or dispute the science in support of climate change.

---

[40]   Ex. A (Document Request Nos. 1-2).
[41]   *Id.* (Document Request No. 1).
[42]   *Id.* (Document Request No. 6).
[43]   *Id.* (Document Request Nos. 7-8).

017-284890-16

44.     The exceptionally broad scope of this investigative demand—nearly 40 years of records across an employee base that now stands at 73,500 people—highlights the pretextual basis for the investigation and the subpoena.  Complying with the Virgin Islands subpoena would impose on ExxonMobil burden and expense incommensurate with any legitimate law enforcement purpose.

45.     In another remarkable irregularity, the subpoena directs ExxonMobil to produce responsive records to Attorney General Walker's office and Defendant Linda Singer within a month's time, by April 15, 2016.[44]  It also instructs ExxonMobil to present any inquiries about compliance to the Attorney General's office or to Singer at Cohen Milstein's offices in Washington, D.C.

## C.     Attorney General Walker Has Improperly Delegated His Law Enforcement Authority to Cohen Milstein

46.     Defendant Cohen Milstein has previously served as private counsel to various attorneys general pursuant to contingent fee arrangements.[45]

47.     As reported by *The New York Times* on December 18, 2014, Defendants Singer and Cohen Milstein regularly pitch state attorneys general and other public officials on possible lawsuits that they propose to file against companies perceived to have deep pockets.  Singer was reported to have contacted attorneys general in Arizona, Connecticut, Nevada, New Mexico, New York, and Washington, to take on major plaintiff-side civil cases on a contingency-fee basis.[46]

---

[44]   *Id.* at 2.

[45]   Retainer Agreement, dated May 15, 2012, and letters between Cohen Milstein and Linda Singer with the Office of the Attorney General of Mississippi regarding their investigation of JPMorgan Chase and Bank of America; Retainer Agreement, dated Apr. 8, 2013, between Cohen Milstein and the City of Chicago.

[46]   Eric Lipton, *Lawyers Create Big Paydays by Coaxing Attorneys General to Sue*, N.Y. Times, Dec. 18, 2014.

16

017-284890-16

48.     Within months of his appointment, Attorney General Walker contracted for legal services with Cohen Milstein and Singer on a contingency-fee basis in another matter.   Under that agreement, Cohen Milstein and Singer pursued a claim against a different American energy company for closing a refinery in the Virgin Islands in contravention of a supposed pledge to continue operations through 2022.[47]   Cohen Milstein and Singer brought a lawsuit against the company on September 15, 2015,[48] which settled soon after.  On February 16, 2016, Cohen Milstein and Singer received $15 million pursuant to that contingency-fee arrangement with Attorney General Walker.[49]

49.     Less than one month later, Attorney General Walker issued the subpoena that Cohen Milstein mailed to ExxonMobil.

50.     On information and belief, Walker and Cohen Milstein have entered into a contingency-fee contract here similar to their previous fee arrangement.

51.     In addition to its past dealings with Attorney General Walker, Defendant Cohen Milstein has been and currently is pursuing a contentious 15-year litigation in an unrelated action against ExxonMobil, in which ExxonMobil has raised serious questions about whether Cohen Milstein and its co-counsel have fully complied with their ethical obligations.

52.     Since 2001, Cohen Milstein, along with co-counsel Terrence Collingsworth, has represented a group of anonymous plaintiffs from Aceh, Indonesia, in a lawsuit for money damages and other relief under the Alien Tort Statute (the "ATS

---

[47]   Y. Peter Kang, *Virgin Islands Sues Hess For $1.5B Over Refinery Closure*, Law360 (Sept. 14, 2015), *available at* http://www.law360.com/articles/702563/virgin-islands-sues-hess-for-1-5b-over-refinery-closure.

[48]   *Id.*

[49]   Bill Kossler, *$220 Hovensa Windfall Honeymoon Already Over*, St. Croix Source (Feb. 16, 2016).

Matter").[50]   The lawsuit alleges that ExxonMobil aided and abetted human rights abuses committed by Indonesian troops assigned by the Indonesian government to protect an Indonesian natural gas facility during an Indonesian civil war.   However, ExxonMobil's role was simply to operate the natural gas facility as a contractor to the Indonesian government.[51]   In addition, while conducting its business in Indonesia, ExxonMobil has worked for generations to improve the quality of life in Indonesia through employment of local workers, provision of health services, and extensive community investment. ExxonMobil categorically denies that it was complicit in any human rights violations and strongly condemns human rights violations in any form.

53.   The ATS Matter is one of a number of cases that have been filed across the country by Collingsworth against multi-national corporations operating overseas.[52]   In recent years, it has come to light in many of those cases that Collingsworth has engaged in repeated misconduct, such as fabricating plaintiffs and claims, bringing claims without authorization from any plaintiffs, and paying fact witnesses $100,000 in an effort to secure favorable testimony.[53]

54.   In *Gonzalez* v. *Texaco*, Collingsworth filed suit for Ecuadorian plaintiffs who claimed that Texaco's petroleum operations caused them physical injuries, including

---

[50]   ExxonMobil is represented in the ATS Matter, as it is in this action, by the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP.

[51]   *Doe I* v. *Exxon Mobil Corp.*, No. 01-1357, Dkt. 533, ¶ 28 (D.D.C. Sept. 10, 2015).

[52]   Those cases include *Gonzalez* v. *Texaco*, No. C. 06-02820 WHA (N.D. Cal. 2006); *Juana Perez 1A* v. *Dole Food Co.*, No. BC412620 (Cal. Super. Ct., L.A. Cnty.); *Jane/John Does 1-144* v. *Chiquita Brands Int'l Inc.*, No. 1:07-cv-01048, Dkt. 3 (D.D.C. Jun. 7, 2007) (Complaint filed by Collingsworth), consolidated into *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, No. 08-01916-MD-MARRA, Dkt. 1 (S.D. Fla. Feb. 25, 2008) (Consolidation Order); *Baloco* v. *Drummond Co.*, No. 7:09-cv-00557, Dkt. 1 (N.D. Ala. Mar. 20, 2009) (Complaint); and *Balcero* v. *Drummond Co.*, No. 2:09-cv-01041, Dkt. 1 (N.D. Ala. May 27, 2009) (Complaint).

[53]   *Drummond Co.* v. *Collingsworth*, No. 9:14-mc-81189-DMM, Dkt. 14 (S.D. Fla. Oct. 24, 2014).

cancer.[54]  However, deposition testimony revealed that three of the plaintiffs' claims were wholly fabricated—neither they nor their family members ever had cancer—and the claims were dismissed.[55]   The episode caused the judge to rebuke Collingsworth, remarking that this was "not the first evidence of misconduct by plaintiffs' counsel in this case" and that Collingsworth "manufactured" the case.[56]  Additional evidence in the case revealed that Collingsworth not only had fabricated claims about whether the plaintiffs had cancer, but had also filed suit on behalf of individuals without their authorization.[57]  The court specifically found that Collingsworth had filed complaints on behalf of "[p]laintiffs [who] were not even aware that a lawsuit had been filed in their names in the United States and none of them had specifically authorized such a suit."[58]

55.     The mounting evidence of misconduct by Cohen Milstein's co-counsel culminated in a scathing opinion issued by an Alabama federal judge in December 2015, in which the judge found that Collingsworth had improperly made payments to witnesses and made repeated and knowing false statements to both the court and to opposing counsel in an effort to conceal the payments.[59]

56.     In addition, just last month, Collingsworth voluntarily dismissed with prejudice a lawsuit he had filed against the Dole Food Company in California state

---

[54]  No. C. 06-02820 WHA (N.D. Cal. 2006).
[55]  *Gonzalez* v. *Texaco*, No. C. 06-02820 WHA, 2007 WL 2255217, at *1-2, 4 (N.D. Cal. Aug. 3, 2007).
[56]  *Id.*
[57]  *Id.* at *2.
[58]  Order Declining to Impose Additional Sanctions for Attorney's Unreasonable and Incompetent Actions, *Gonzalez* v. *Texaco*, No. C 06-02820 WHA, Dkt. 371 (N.D. Cal. Dec. 21, 2009).
[59]  Memorandum Opinion and Order, *Drummond, Inc.* v. *Collingsworth*, No. 2:11-cv-3695-RDP, Dkt. 417 (N.D. Ala. Dec. 7, 2015) (The judge stated he "ha[d] no hesitation in finding that there is (at least) probable cause to believe that Collingsworth . . . engaged in witness bribery and suborning perjury," and that "this alleged witness bribery continues to this day.").

court.[60]  He did so after it came to light that Collingsworth's colleagues had offered bribes to third parties to provide testimony favorable to the plaintiffs in that lawsuit.[61]

57.     Based on this, and other evidence, ExxonMobil has been pressing both Cohen Milstein and Collingsworth for over a year to produce all records of payments to any witnesses in the ATS Matter.  Among other things, ExxonMobil has pressed Cohen Milstein to demonstrate its compliance with its ethical obligations to ensure the accuracy of representations made by its co-counsel on behalf of their mutual clients, including whether any payments have been made to witnesses.  Cohen Milstein apparently has consulted with outside counsel to address its obligations in view of its co-counsel's misconduct, and the parties are in the midst of litigating ExxonMobil's supplemental motion to compel additional documents from Cohen Milstein and Collingsworth.

58.     In light of its involvement in this contentious litigation against ExxonMobil, the very target of Attorney General Walker's investigation, Cohen Milstein cannot be the neutral, disinterested prosecutor required by due process under the United States Constitution and the Texas Constitution.

**D.     ExxonMobil Has Been Injured and Continues To Be Injured by Defendants' Conduct**

59.     ExxonMobil has long been active in the policy debate about potential responses to climate change.  Indeed, since 2009, ExxonMobil has publicly advocated for a carbon tax as the preferred method to regulate carbon emissions.  Proponents of a carbon tax on greenhouse gas emissions argue that increasing taxes on carbon can "level

---

[60]   Request for Dismissal, *Juana Perez 1A* v. *Dole Food Co.*, BC412620 (March 2, 2016).
[61]   *Juana Perez 1A* v. *Dole Food Co.*, Case No. BC412620, Transcript of Deposition of Adolfo Enrique Guevara Cantillo, at 72:22-73:19 (Cal. Sup. Ct. Jan. 27, 2016); *Juana Perez 1A* v. *Dole Food Co.*, Case No. BC412620, Declaration of Andrea Neuman in Support of Addendum to the Joint Status Conference Statement for February 11, 2016 Conference (Cal. Sup. Ct. Feb. 4, 2016); *Juana Perez 1A* v. *Dole Food Co.*, Case No. BC412620, Plaintiffs' Request for Dismissal (Cal. Sup. Ct. Mar. 2, 2016).

017-284890-16

the playing field among different sources of energy."[62]  While the coalition of attorneys

general is entitled to disagree with ExxonMobil's position, no member of that coalition,

including Attorney General Walker, is entitled to silence or seek to intimidate one side of

that debate (or the debate about any other important public issue) through the issuance of

an overbroad and burdensome subpoena that is facially premised upon a pretextual

investigation that has been delegated to a law firm already in contentious litigation with

the investigation's target.   ExxonMobil intends—and has a Constitutional right—to

continue to advance its perspective in the national discussions over how to respond to

climate change.  Its right to do so should not be violated through this exercise of

government power.

      60.    As a result of the improper and politically-motivated investigation

launched by Attorney General Walker and impermissibly delegated to Cohen Milstein

and Singer, ExxonMobil has suffered, now suffers, and will continue to suffer violations

of its rights under the First, Fourth, and Fifth Amendments to the United States

Constitution[63] and under Sections Eight, Nine, and Nineteen of Article One of the Texas

Constitution.  The chilling effect of this inquiry, which discriminates based on viewpoint

to target one side of an ongoing policy debate, strikes at protected speech at the core of

the First Amendment.  Defendants' burdensome demand for irrelevant records violates

the Fourth Amendment's reasonableness requirement, as well as its prohibition on fishing

expeditions.   Finally, the delegation of this investigation—which carries penalties

available only to government prosecutors—to a private law firm, acting on a

---

[62]  Jeremy Carl & David Fedor, *Revenue-Neutral Carbon Taxes in the Real World: Insights from British Columbia and Australia,* Hoover Institution at Stanford University: Shultz-Stephenson Task Force on Energy Policy 1 (2012).

[63]  The federal constitutional rights have been made applicable to the State of Texas through the Fourteenth Amendment and to the Virgin Islands through 48 U.S.C. § 1561.

017-284890-16

contingency-fee basis and embroiled in claims of misconduct in a long-running litigation with ExxonMobil, cannot be reconciled with the Fifth Amendment's requirement that only a neutral and impartial prosecutor can satisfy due process.

61.     Acting under the laws, customs, and usages of the Virgin Islands, Attorney General Walker and his designees Cohen Milstein and Singer have subjected ExxonMobil, and are causing ExxonMobil to be subjected, to the deprivation of rights, privileges, and immunities secured by the United States Constitution and the Texas Constitution.   ExxonMobil's rights are made enforceable against Defendants, all of whom are acting under the color of law, by the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution and 48 U.S.C. § 1561, all within the meaning and contemplation of 42 U.S.C. § 1983, and by Section Nineteen of Article One of the Texas Constitution.

62.     In addition, Defendants have committed an abuse of process under common law. Defendants issued the subpoena without the reasonable suspicion required by law and based on an ulterior motive to silence those who express views on climate change with which they disagree. Defendants' conduct has caused injury to ExxonMobil.

63.     Absent relief, Defendants will continue to deprive ExxonMobil of these rights, privileges, and immunities.

## VI.     CAUSES OF ACTION

### A.     First Cause of Action

**Violation of ExxonMobil's First and Fourteenth Amendment Rights**
(48 U.S.C. § 1561 and 42 U.S.C. § 1983)

64.     ExxonMobil repeats and realleges paragraphs 1 through 63 above as if fully set forth herein.

017-284890-16

65.     The subpoena's focus on one side of a policy debate in an apparent effort to silence, intimidate, and deter those possessing a particular viewpoint from participating in that debate contravenes, and any effort to enforce the subpoena would further contravene, the rights provided to ExxonMobil by the First Amendment to the United States Constitution, made applicable to the State of Texas by the Fourteenth Amendment and to the Virgin Islands by 48 U.S.C. § 1561, and by Section Eight of Article One of the Texas Constitution.

66.     The subpoena improperly targets political speech and amounts to an impermissible content-based restriction on speech.  The effect of the subpoena is to (i) deter ExxonMobil from participating in the public debate over climate change now and in the future and (ii) chill others from expressing an opinion on climate change that runs counter to the view held by a coalition of some state officials, including Attorney General Walker, now and in the future.

67.     The subpoena does not constitute the least restrictive means of accomplishing any compelling government purpose and is not narrowly tailored to advance any compelling government interest.

**B.     Second Cause of Action**

**Violation of ExxonMobil's Fourth and Fourteenth Amendment Rights**
(48 U.S.C. § 1561 and 42 U.S.C. § 1983)

68.     ExxonMobil repeats and realleges paragraphs 1 through 67 above as if set forth fully herein.

69.     Defendants' issuance and mailing of the subpoena on ExxonMobil contravenes, and any effort to enforce the subpoena would further contravene, the rights provided to ExxonMobil by the Fourth Amendment to the United States Constitution,

017-284890-16

made applicable to the State of Texas by the Fourteenth Amendment and to the Virgin

Islands by 48 U.S.C. § 1561, and by Section Nine of Article One of the Texas

Constitution to be secure in its papers and effects against unreasonable searches and

seizures.

70.     The subpoena is an unreasonable search and seizure because it is vastly

overbroad, constitutes an abusive fishing expedition, and imposes an unwarranted burden

on ExxonMobil.

### C.     Third Cause of Action

#### Violation of ExxonMobil's Fifth and Fourteenth Amendment Rights
(48 U.S.C. §§ 1561, § 1571, 1591, 1611, and 42 U.S.C. § 1983)

71.     ExxonMobil repeats and realleges paragraphs 1 through 70 above as if

fully set forth herein.

72.     Attorney General Walker's delegation of investigative and prosecutorial

authority to Cohen Milstein and Singer contravenes the rights provided to ExxonMobil

by the Fifth Amendment to the United States Constitution, made applicable to the State

of Texas by the Fourteenth Amendment and to the Virgin Islands by 48 U.S.C. § 1561,

and by Section Nineteen of Article One of the Texas Constitution not to be deprived of

life, liberty, or property without due process of law, as well as the separation of powers

doctrine made applicable to the Virgin Islands by 48 U.S.C. §§ 1571, 1591, and 1611.

73.     The delegation of Defendant Walker's investigative and prosecutorial

authority violates the due process of law because (i) this investigation could result in

penalties available only to government prosecutors; (ii) Cohen Milstein and Singer are

believed to be compensated on a contingency fee basis; and (iii) Cohen Milstein is

engaged in ongoing and unusually contentious litigation against ExxonMobil.

017-284890-16

### D.    Fourth Cause of Action

### Abuse of Process Claim

74.    ExxonMobil repeats and realleges paragraphs 1 through 73 above as if fully set forth herein.

75.    Defendants committed an abuse of process under common law by (i) issuing and mailing the subpoena without reasonable suspicion, as required by the authorizing statute, in what amounts to a fishing expedition; (ii) having an ulterior motive for issuing and mailing the subpoena, namely an intent to prevent ExxonMobil from exercising its right to express views disfavored by Defendants and to extract an unwarranted financial settlement from ExxonMobil; and (iii) causing injury to ExxonMobil's reputation and its ability to exercise its First Amendment rights as a result.

### E.    Fifth Cause of Action

### Declaration of the Parties' Respective Rights
(Tex. Civ. Prac. & Rem. Code § 37.003)

76.    ExxonMobil repeats and realleges paragraphs 1 through 75 above as if fully set forth herein.

77.    For the foregoing reasons, ExxonMobil is entitled to a declaration that enforcement of the subpoena, as drafted, against ExxonMobil is impermissible under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 48 U.S.C. § 1561 and under Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution, and constitutes an abuse of process under common law.

017-284890-16

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants as follows:

1.      That a declaratory judgment be entered pursuant to Tex. Civ. Prac. & Rem. Code § 37.003, declaring that the issuance and mailing of the subpoena violates ExxonMobil's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 48 U.S.C. § 1561, and Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution;

2.      That a declaratory judgment be entered pursuant to Tex. Civ. Prac. & Rem. Code § 37.003, declaring that the issuance and mailing of the subpoena constitutes an abuse of process, in violation of common law;

3.      All costs of court together with any and all such other and further relief as this Court may deem proper.

017-284890-16

Dated:  April 13, 2016


EXXON MOBIL CORPORATION

By:  /s/ Patrick J. Conlon
Patrick J. Conlon
State Bar No. 24054300
patrick.j.conlon@exxonmobil.com
Daniel E. Bolia
State Bar No. 24064919
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002
(832) 624-6336


/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
(*pro hac vice* pending)
Michele Hirshman
(*pro hac vice* pending)
Daniel J. Toal
(*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON, LLP
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300
Fax: (202) 223-7420

*Counsel for Exxon Mobil Corporation*

/s/ Ralph H. Duggins
Ralph H. Duggins
State Bar No. 06183700
rduggins@canteyhanger.com
Philip A. Vickers
State Bar No. 24051699
pvickers@canteyhanger.com
Alix D. Allison
State Bar. No. 24086261
aallison@canteyhanger.com
CANTEY HANGER LLP
600 W. 6th St. #300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807


/s/ Nina Cortell
Nina Cortell
State Bar No. 04844500
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
301 Commerce Street
Suite 2600
Fort Worth, TX 76102
(817) 347-6600
Fax: (817) 347-6650

017-284890-16

# Exhibit A

017-284890-16

## UNITED STATES VIRGIN ISLANDS
## DEPARTMENT OF JUSTICE

| | | |
|---|---|---|
| IN RE INVESTIGATION OF VIOLATIONS | ) | |
| OF THE CRIMINALLY INFLUENCED AND | ) | SUBPOENA |
| CORRUPT ORGANIZATIONS ACT | ) | |
| | ) | |

TO:   Exxon Mobil Corporation
      5959 Las Colinas Boulevard
      Irving, Texas 75039-2298

You are suspected to have engaged in, or be engaging in, conduct constituting a civil violation of the Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. § 605, by having engaged or engaging in conduct misrepresenting Your knowledge of the likelihood that Your products and activities have contributed and are continuing to contribute to Climate Change in order to defraud the Government of the United States Virgin Islands ("the Government") and consumers in the Virgin Islands, in violation of 14 V.I.C.§ 834 (prohibiting obtaining money by false pretenses) and 14 V.I.C. § 551 (prohibiting conspiracy to obtain money by false pretenses).

Therefore, YOU ARE HEREBY DIRECTED, by the authority granted to the Attorney General of the United States Virgin Islands ("USVI"), pursuant to the provisions of 14 V.I.C. § 612, to produce and deliver the documents responsive to the inquiries set forth herein, on or before **April 15, 2016**, directed to the attention of Attorney General Claude Earl Walker, Esq.

Failure to comply with this subpoena may result in an enforcement action being brought against you pursuant to 14 V.I.C. § 612(k).

017-284890-16

## **INSTRUCTIONS**

A.     If any document, report, study, memorandum or other written material or information is withheld or not identified under claim of privilege, furnish a list identifying each document or requested information together with the following information (as relevant): date, author, sender, recipient, persons to whom copies were furnished or information provided together with their job titles, subject matter of the document, the basis for the privilege, and the paragraph or paragraphs of the Request(s) to which the document or information is responsive.

B.     In each instance in which a document is produced in response to a Request, the current version should be produced together with all earlier versions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions.

**C.     Any document produced whose text is not already searchable should be processed through Optical Character Recognition ("OCR") so that it is fully searchable.**

D.     This Investigative Subpoena calls for all described documents in your possession, custody, or control without regard to the person or persons by whom or for whom the documents were prepared (e.g., your company employees, contractors, vendors, distributors, service providers, competitors, or others).

E.     The following procedures shall apply to the production, inspection, and copying of documents:

(a)     You shall produce original, complete documents. Documents shall be produced in the order that the documents are maintained in your files, in original folders, with the folder's original file tabs. In response to this Subpoena, true copies of original

2

017-284890-16

documents may be submitted in lieu of originals, provided that you retain the original documents in such manner as to be able to produce them if later required.

1.  Any documents produced in response to this Investigative Subpoena should be provided as a Group 4 compression single-page "TIFF" image that reflects how the source document would have appeared if printed out to a printer attached to a computer viewing the file. Extracted text should be included in the manner provided herein. **To the extent that extracted text does not exist, these images should be processed through OCR so that they are fully searchable.** Extracted text and OCR should be provided in separate document level text files. "Load files" shall be produced to accompany the images and shall facilitate the use of the litigation support database systems to review the produced images.

2.  Document Unitization. Each page of a document shall be electronically converted into an image as described above. If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as it existed in the original when creating the image file and appropriately designated in the load files. The corresponding parent/attachment relationships, to the extent possible, shall be provided in the load files furnished with each production.

3.  Bates Numbering. Each page of a produced document shall have a legible, unique page identifier ("Bates Number") electronically branded onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document. To ensure that the Bates Numbers do not obscure portions of the documents, the images may be proportionally reduced to create a larger margin in which the Bates Number may be branded. There shall be no other legend or stamp placed on the document image, except those sections of a document that are redacted to eliminate material protected from disclosure by the attorney-client or work product privileges shall have the legend "REDACTED" placed in the location where the redaction(s) occurred or shall otherwise note the location and/or location of the information for which such protections are claimed.

4.  File Naming Conventions. Each document image file shall be named with the unique Bates Number of the page of the document in the case of single-page TIFFs, followed by the extension "TIF". Each document shall be named with a unique document identifier. Attachments shall have their own unique document identifiers.

5.  Production Media. The documents should be produced on CD-ROM, DVD, external hard drive (with standard Windows PC compatible interface), (the "Production Media"). Each piece of Production Media shall identify a production number corresponding to the production "wave" the documents on the Production Media are associated with (e.g., "V001", "V002"), as well as the volume of the material in that production wave (e.g., "-001", "-002").

3

017-284890-16

For example, if the first production wave comprises document images on three hard drives, you shall label each hard drive in the following manner: "V001-001", "V001-002", "V001-003". Additional information that shall be identified on the physical Production Media shall include: (1) text referencing that it was produced in response to this Investigative Subpoena, (2) your name, (3) the production date, and (4) the Bates Number range of the materials contained on the Production Media.

6.  Objective Coding/Extracted Meta Data.  You shall produce with each production of documents extracted metadata for each document (the "Objective Coding") included in the load file. The data file shall include the fields and type of content set forth in the **"SPECIAL INSTRUCTIONS FOR ELECTRONICALLY STORED MATERIAL"** section. Objective Coding shall be labeled and produced on Production Media in accordance with the provisions set forth above.

7.  Native format for Excel and databases.  To the extent that such documents exist in Excel or some other spreadsheet, produce the document in Excel. To the extent that the document constitutes a database, produce the document in Access.

(b)  All attachments to responsive documents shall be produced attached to the responsive documents.

(c)  No portion of any documents will be masked and the entire document shall be produced.

(d)  The documents shall be produced at the location set forth or at such other locations as counsel agree.

(e)  Documents shall be available on reasonable notice for inspection and copying after initial production throughout the term of the investigation or litigation. The documents shall be maintained in the order in which they were produced.

(f)  You shall label each group of documents in the following manner: Response to Request No. 1; Response to Request No. 2, etc., and identify the Bates Number range for the corresponding documents that are responsive or written responses.

(g)  Provide a key to all abbreviations used in the documents, providing a method of identifying all documents requiring use of the key.

(h)  If you obtain information or documents responsive to any request after you have submitted your written responses or production, you should supplement your responses and/or production with any new and or different information and/or documents that become available to you.

4

017-284890-16

(i)    If any document responsive to this Subpoena was lost or has been removed, destroyed, or altered prior to the service of this Subpoena, furnish the following information with respect to each such document:

- a description to the extent known, and the last time and location that the document was known to be or is believed to have existed;

- the date, sender, recipient, and other persons to whom copies were sent, subject matter, present location, and location of any copies; and

- the identity of any person authorizing or participating in any removal, destruction, or alteration; date of such removal, destruction or alteration; and the method and circumstances of such removal, destruction, or alteration.

F.    This subpoena imposes a continuing duty to produce promptly any responsive information or item that comes into your knowledge, possession, custody, or control after your initial production of responses to the requests.

## SPECIAL INSTRUCTIONS

Electronic documents should be produced in accordance with the following instructions:

A.    Single page TIFFs at a 300 DPI resolution which are named for the Bates Number of the page. There should NOT be more than 1000 images per folder.

B.    **Document level text files containing OCR or extracted text named with the** Bates Number of the first page of the document.

C.    Data load file containing all of the metadata fields (both system and application – see list below) from the original Native documents – .dat for Concordance.

D.    The Concordance .dat file of extracted metadata should be delimited with the Concordance default characters – ASCII 020 for the comma character and ASCII 254 for the quote character. The use of commas and quotes as delimiters is not acceptable.

5

017-284890-16

E.     The database field names should be included in the first line of the metadata file listed in the order they appear in the file.

F.     An image load file for Concordance – such as ".opt."

G.     For electronic documents created in Excel (spreadsheets) or Access (databases), provide those documents in Native format as well as a TIFF placeholder.

H.     For all documents produced, provide the following:

| Field # | Field Name | Format | Description |
|---|---|---|---|
| 1 | BEGDOCNO | Text | Image key of first page of document |
| 2 | ENDDOCNO | Text | Image key of last page of document |
| 3 | BEGATTACH | Text | For emails/attachments ONLY:  Image key of the first page of the parent email.<br><br>Please DO NOT populate these fields for emails with no attachments. |
| 4 | ENDATTACH | Text | For emails/attachments ONLY:  Image key of the last page of the last attachment.<br><br>Please DO NOT populate these fields for emails with no attachments. |
| 5 | CUSTODIAN | Text | Custodian from whom documents were collected (semi-colon delimited, if multiple entries) |
| 6 | AUTHOR | Text | Email "From" data or user/author name from electronic files |
| 7 | RECIPIENT | Text | Email "To" data (semi-colon delimited, if multiple entries) |
| 8 | CC | Text | Email "CC" data (semi-colon delimited, if multiple entries) |
| 9 | BCC | Text | Email "BCC" data (semi-colon delimited, if multiple entries) |

017-284890-16

| Field # | Field Name | Format | Description |
|---------|-----------|--------|-------------|
| 10 | MAILSUBJECT | Text | Email subject. This value should be populated down to any children/attachments of the parent email. |
| 11 | MAILDATE | MM/DD/YYYY | Email date sent. This value should be populated down to any children/attachments of the parent email. |
| 12 | MAILTIME | HH:MM:SS | Email time sent, in military time. This value should be populated down to any children/attachments of the parent email. |
| 13 | ATTACHMENTS | Text | Semi-colon delimited list of the original file names of any attachments to an email |
| 14 | FILENAME | Text | For emails: Mail subject<br>For attachments and e-files: File name from source media |
| 15 | HASH_VALUE | Text | Hash value generated for purposes of de-duplication if performed |
| 16 | FileExt | Text | Original file extension for the email or electronic file being produced (e.g., .eml, .pdf, .xls, .doc) |

## DEFINITIONS

1. "All" shall be construed to include the collective as well as the singular and shall mean "each," "any," and "every."

2. "Any" shall be construed to mean "any and all."

3. "Climate Change" refers to the general subject matter of changes in global or regional climates that persist over time, whether due to natural variability or as a result of human activity. Any documents or communications using any of the terms "climate change," "climatology," "climate science," "climate model," "climate modeling," "global warming," "greenhouse gas," "greenhouse effect," "$CO_2$ greenhouse," "climate skeptics," "climate skepticism," "global

7

017-284890-16

cooling," "solar variation," "arctic shrinkage," "carbon tax," "climate legislation," or "Keeling Curve" concern climate change, although documents or communications need not include any of these terms to concern climate change.  Any documents or communications concerning rising sea levels, Arctic and/or Antarctic ice melt, declining sea ice, melting glaciers, declining snowfall, oceanic warming, ocean acidification, or increases in extreme weather events—or the opposites of these phenomena (e.g., dropping sea levels, oceanic cooling)—concern climate change, although documents or communications need not refer to any of these phenomena to concern climate change.

4. "Communications" mean any exchange of information by any means of transmissions, sending or receipt of information of any kind by or through any means including but not limited to: verbal expression; gesture; writings; documents; language (machine, foreign, or otherwise) of any kind; computer electronics; email; SMS, MMS, or other "text" messages; messages on "social networking" platforms (including but not limited to Facebook, Google+, MySpace, and Twitter); shared applications from cell phones, "smartphones," netbooks, and laptops; sound, radio, or video signals; telecommunication; telephone; teletype; facsimile; telegram; microfilm; or by any other means.  "Communications" also shall include, without limitation, all originals and copies of inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, press, publicity or trade releases and the like that are provided by you or to you by others.  Any Communications produced, including emails, should include the original sender, all original recipients, the date and time, and any files originally attached to such emails in the form and filetype in which they were originally attached.

8

017-284890-16

5. "Concerning" means directly or indirectly mentioning or describing, relating to, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting, or constituting, in whole or in part, a stated subject matter.

6. "Documents" mean any writing or any other tangible thing, whether printed, recorded (in audio, video, electronically or by any other means), reproduced by any process, or written or produced by hand, including but not limited to: letters; memoranda; notes; opinions; books; reports; studies; agreements; statements; communications (including inter-company and intra-company communications); correspondence; telegrams; email; instant messages; chat logs; SMS, MMS or other "text" messages; posted information; messages; chat logs on "social networking" platforms (including but not limited to Facebook, Google+, MySpace and Twitter); logs; bookkeeping entries; summaries or records of personal conversations; diaries; calendars; telephone messages and logs; forecasts; photographs; images; tape recordings; models; statistical statements; graphs; laboratory and engineering reports; notebooks; charts; tabulations; maps; plans; drawings; minutes; bylaws; resolutions; records of conferences; expressions or statements of policy; lists of persons attending meetings or conferences; lists of clients or customers or suppliers; reports or summaries of interviews; opinions or reports of negotiations; brochures; pamphlets; advertisements; circulars; trade letters; press releases; drafts of any document and revisions of drafts of any document; and any other similar paper or record in any form or medium whatsoever. The term also includes a copy of a document where the copy is not exactly the same as the original. The term also includes emails and other documents made or stored in electronic form, whether kept on computers, computer tapes,

disks, drives, Cloud storage, or other media upon which information may be recorded of any type.

7. "Identify" means:

    (a)    When used in connection with a Document, provide the nature of the Document, its title, its description (e.g., memorandum, letter, contract), date, author, its current location, its current custodian, and the number of pages.

    (b)    When used in connection with a person, provide that person's name, current residential address and telephone number, job title, and current business address and telephone number. (If current information is not available, provide last-known address and telephone number.)

    (c)    When used in reference to an "artificial person" or entity such as a corporation or partnership, provide (1) the organization's full name and trade name, if any; (2) the address and telephone number of its principle place of business; and (3) the names and titles of the entity's officers, directors, managing agents, or employees.

    (d)    When used in connection with an oral communication, provide the nature of that communication, the parties to it, the date, place, and substance of that communication, and the identification of any document concerning it.

8. "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

9. "Person" means any natural person or such person's legal representative; any partnership, domestic or foreign corporation, or limited liability company; any company, trust, business entity, or association; and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, or trustee.

10. "You" or "Your" refers to Exxon Mobil Corporation, any present or former predecessor, successor, parent, subsidiary, division, d/b/a company, and affiliated entities, as well as all owners, officers, agents, employers, employees, or other representatives thereof, or any other person acting in whole or in part on behalf of any of the foregoing entities. These terms also

017-284890-16

refer to the ExxonMobil Foundation, formerly known as the Esso Education Foundation, and/or the Exxon Education Foundation.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 1977 to the present.  The time limits should not be construed as date limits; for example, if a policy, contract, or other document in effect during the relevant time period was created before the relevant time period, then such document must be produced.

## DOCUMENTS AND INFORMATION TO BE PROVIDED

1. All Documents or Communications reflecting or concerning studies, research, or other reviews You conducted or funded (in whole or in part) regarding the certainty, uncertainty, causes, or impacts of Climate Change and models to assess or predict Climate Change or its impacts, as well as all Documents or Communications reflecting or concerning steps You took to address the potential impact of Climate Change on Your operations.

2. All Documents or Communications reflecting or concerning studies, research or other reviews You conducted or funded (in whole or in part) regarding whether and how Your products or activities impact Climate Change at a regional or global level.

3. All public statements You made, including but not limited to advertisements, op-eds, letters to the editor, speeches, and corporate publications, concerning Climate Change, including all drafts of such statements and internal Communications regarding such statements.

017-284890-16

4.  All minutes of meetings of Your Board and any Board committees reflecting discussions concerning Climate Change and any memoranda to the Board or from Board members concerning Climate Change.

5.  All Documents or Communications concerning any potential impacts on Your sales, revenue, or business caused by Climate Change itself, by public policies responding to Climate Change (including any legislation or regulation concerning Climate Change), or by public perceptions of Climate Change.

6.  All Documents or Communications concerning research, advocacy, strategy, reports, studies, reviews, or public opinions regarding Climate Change sent to or received from: ███████

███ ; ████████████████████████████████

███████████ ; ██ ██ █████████████ ; ████

█████████████ ; ██████████████████████ █

████████████████ ; █████████████████████

████████ ; ████████████████████████████ ;

████████████████████████████████████ ;

████████████ ; ████████████████████████ ; █

████████████ ; ████████████████████████ ;

████ ; ██████████████████ ; ████████████

████ ; ████ █ █████████ ; ██████████████

███████████████ ; ███████████████████████

████ ; ████████████████████████████████

████████████████ ; ████████████ █████████

████████ ; █████████████████████████████ ;

017-284890-16



017-284890-16



; and any

other organizations engaged in research or advocacy concerning Climate Change or public

policies, including legislation, relating to Climate Change. In Your Response to this Request,

include all Communications concerning the role of each of these organizations in conducting

research, studies, or reviews of Climate Change or in attempting to affect public opinions

regarding Climate Change. In Your Response to this Request, include all records of payments

to entities covered by this Request.

7. All Documents or Communications concerning research, advocacy, strategy, reports, studies,

reviews, or public opinions regarding Climate Change sent to, received from, or about: ████

████; ████████; ████████; ████████; ████████; ████████;

████; ████; ████████; ████████; ████████; ████;

████████; ████████; ████████; ████████; ████;

████; ████████; ████████ ████████; ████████; ████████;

████; ████████; ████████; ████████; ████████;

████████; ████████; ████████; ████████; ████;

████; ████████; ████████; ████████; ████████; ████;

████; and any other persons conducting research or advocacy concerning Climate Change.

In Your Response to this Request, include all Communications regarding the role of each of

these individuals in conducting research, studies or reviews of Climate Change or in attempting

017-284890-16

to affect public opinions regarding Climate Change.  In Your Response to this Request, include all records of payments to individuals covered by this Request.

8.  All Documents or Communications concerning research, advocacy, strategy, reports, studies, reviews, or public opinions regarding Climate Change sent to or received from: ███████ ████; ███████████; ██████████; █████████████; █████████; ██████ ██████; ██████████; ████████████; ████████████████; ███████; ████████████████; ███████████; █████████; █████████; and any other current or former employees or contractors conducting research or advocacy concerning Climate Change.  In Your Response to this Request, include all Communications regarding the role of each of these individuals in conducting research, studies or reviews of Climate Change or in attempting to affect public opinions regarding Climate Change.  In Your Response to this Request, include all records of payments to individuals covered by this Request.

9.  All Documents or Communications concerning Your efforts to employ, fund, associate with, collaborate with, or work with any organizations, entities, associations, individuals, or groups of persons to influence public views regarding the likelihood that or extent to which carbon dioxide, methane, oil and gas extraction or use, or any of Exxon Mobil Corporation's products or activities directly or indirectly impact Climate Change.   Include Documents or Communications evidencing such employment, funding, association, collaboration, or work.

10. All Documents concerning the "$CO_2$ Greenhouse" research project or any other project researching the greenhouse effects of carbon dioxide or other greenhouse gases.

11. All Documents (including drafts) sent to or received by, and all Communications with or about, public relations firms regarding Your statements concerning or strategies for addressing

017-284890-16

Climate Change.  Include in your response a list, or Documents sufficient to Identify, all public

relations firms that have been retained or consulted by You or made proposals to You

concerning Climate Change.

12. All Documents and Communications concerning your strategies for publicly discussing

Climate Change, including but not limited to Communications to employees and

spokespersons about how to discuss Climate Change.

13. All Documents and Communications concerning the following articles, their authors, their
content, or their impact:

    (a) All articles in the series "Exxon: The Road Not Taken," published by *InsideClimate News*
        since September 1, 2015.

    (b) Articles published in the *Los Angeles Times* since September 1, 2015 concerning You and
        Climate Change

14. All Documents and Communications concerning investigations of your statements regarding

Climate Change by any state attorney general, other enforcement agency, or environmental or

other organization.

15. All Communications since June 1, 2015 with or about the ██████████████

    ██████.

16. All Documents concerning Your budget, spending, or plans for public relations, advertising,

or other advocacy relating to Climate Change.

        **NOTE:** This subpoena does not require that you travel to the United States Virgin Islands

or to the Department of Justice. You may comply with this Subpoena Duces Tecum by forwarding

a true and correct copy of any document or other item requested, postmarked prior to the date for

which production has been designated, with a signed and notarized copy of the attached

16

017-284890-16

"CERTIFICATE OF CUSTODIAN OF RECORDS." Failure to appear with, or deliver the requested information, as stated above, shall be deemed a violation of 14 V.I.C. § 612 and will subject you to such sanctions and penalties as are determined by law. Failure to deliver a signed and notarized copy of the attached "CERTIFICATE OF CUSTODIAN OF RECORDS" will be considered a failure to comply with this subpoena.

WHEREFORE, I have set my hand this **15** day of March, 2016.

SUBMITTED BY:

CLAUDE EARL WALKER
Attorney General

By: _____
Claude Earl Walker, Esq.
Attorney General
3438 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802
(340) 774-5666

17

017-284890-16

## CERTIFICATE OF CUSTODIAN OF RECORDS

UNITED STATES VIRGIN ISLANDS      )
                                        )
                                        )

         COMES NOW _____, first being duly sworn, deposes and says:

         1.     That the deponent is the _____ for Exxon Mobil Corporation and, in such capacity, is its custodian of records.

         2.     That on the ____ day of _____, 2016, the deponent was served with a subpoena calling for the production of records.

         3.     That the deponent has examined the original of those records and has made or caused to be made a true and exact copy of them and that the reproduction of them attached hereto is true and complete.

         4.     That the original of those records was made at or near the time of the act, event, condition or opinion recited therein by or from information transmitted by a person with knowledge, in the course of a regularly conducted activity of the deponent or the office or company in which the deponent is engaged.

         5.     I further certify to the best of my knowledge, information, and belief that all documents or things required to be produced pursuant to the attached subpoena issued on _____, 2016 have been produced.

         DATED this ____ day of _____, 2016.


                                _____
                                CUSTODIAN OF RECORDS

SUBSCRIBED and SWORN TO before me
by _____ this
_____ day of _____, 2016.

_____
NOTARY PUBLIC

18



CERTIFIED MAIL

7011 3500 0000 8521 9145



UNITED STATES POSTAGE
PITNEY BOWES
$ 007.67⁰
02 1P
0000863925    MAR 15 2016
MAILED FROM ZIP CODE 20005



COHEN MILSTEIN

Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

N. Becker

Exxon Mobil Corp.
5959 Las Colinas Boulevard
Irving, Texas 75039-2298

017-284890-16

# Exhibit B

017-284890-16

## AGs United For Clean Power Press Conference[*]
### March 29, 2016: 11:35 am – 12:32 pm

**AG Schneiderman:**  Thank you, good morning.  I'm New York's Attorney General, Eric Schneiderman.  I thank you for joining us here today for what we believe and hope will mark a significant milestone in our collective efforts to deal with the problem of climate change and put our heads together and put our offices together to try and take the most coordinated approach yet undertaken by states to deal with this most pressing issue of our time.  I want to thank my co-convener of the conference, Vermont Attorney General, William Sorrel, who has been helping in joining us here and been instrumental in making today's events possible, and my fellow attorneys general for making the trip to New York for this announcement.  Many of them had been working for years on different aspects of this problem to try and preserve our planet and reduce the carbon emissions that threaten all of the people we represent.  And I'm very proud to be here today with Attorney General George Jepsen of Connecticut, Attorney General Brian Frosh of Maryland, Attorney General Maura Healey of Massachusetts, Attorney General Mark Herring of Virginia, and Attorney General Claude Walker of the U.S. Virgin Islands.

We also have staff representing other attorneys general from across the country, including: Attorney General Kamala Harris of California, Matt Denn of Delaware, Karl Racine of the District of Columbia, Lisa Madigan of Illinois, Tom Miller of Iowa, Janet Mills of Maine, Lori Swanson of Minnesota, Hector Balderas of New Mexico, Ellen Rosenblum of Oregon, Peter Kilmartin of Rhode Island and Bob Ferguson of Washington.

And finally, I want to extend my sincere thanks to Vice President Al Gore for joining us.  It has been almost ten years since he galvanized the world's attention on climate change with his documentary *An Inconvenient Truth.*

And, I think it's fair to say that no one in American public life either during or beyond their time in elective office has done more to elevate the debate of our climate change or to expand global awareness about the urgency of the need for collective action on climate change than Vice President Gore.  So it's truly an honor to have you here with us today.

---

[*]   The following transcript of the AGs United For Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

So we've gathered here today for a conference – the first of its kind conference of attorneys general dedicated to coming up with creative ways to enforce laws being flouted by the fossil fuel industry and their allies in their short-sighted efforts to put profits above the interests of the American people and the integrity of our financial markets. This conference reflects our commitment to work together in what is really an unprecedented multi-state effort in the area of climate change. Now, we have worked together on many matters before and I am pleased to announce that many of the folks represented here were on the Amicus Brief we submitted to the United States Supreme Court in the *Friedrichs* v. *California Teacher Association* case. We just got the ruling that there was a four-four split so that the American labor movement survives to fight another day. And thanks, thanks to all for that effort and collaboration. It shows what we can do if we work together. And today we are here spending a day to ensure that this most important issue facing all of us, the future of our planet, is addressed by a collective of states working as creatively, collaboratively and aggressively as possible.

The group here was really formed when some of us came together to defend the EPA's Clean Power Plan, the new rules on greenhouse gases. And today also marks the day that our coalition is filing our brief in the Court of Appeals for the District of Columbia. In that important matter we were defending the EPA's rules. There is a coalition of other states on the other side trying to strike down the rules, but the group that started out in that matter together was 18 states and the District of Columbia. We call ourselves The Green 19, but now that Attorney General Walker of the Virgin Islands has joined us our rhyme scheme is blown. We can't be called The Green 19, so now we're The Green 20. We'll come up with a better name at some point.

But, ladies and gentlemen, we are here for a very simple reason. We have heard the scientists. We know what's happening to the planet. There is no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up. The U.S. Defense Department, no radical agency, recently called climate change an urgent and growing threat to our national security. We know that last month, February, was the furthest above normal for any month in history since 1880 when they started keeping meteorological records. The

2

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

facts are evident.  This is not a problem ten years or twenty years in the future.  [There are] people in New York who saw what happened with the additional storm surge with Super Storm Sandy.  We know the water level in New York Harbor is almost a foot higher than it was.    The New York State Department of Environmental Conservation, not some radical agency, predicts that if we continue at this pace, we'll have another 1.5 feet of water in New York Harbor.  It'll go up by that much in 2050.  So today, in the face of the gridlock in Washington, we are assembling a group of state actors to send the message that we are prepared to step into this breach.  And one thing we hope all reasonable people can agree on is that every fossil fuel company has a responsibility to be honest with its investors and with the public about the financial and market risks posed by climate change.  These are cornerstones of our securities and consumer protection laws.

My office reached a settlement last year based on the enforcement of New York securities laws with Peabody Energy.  And they agreed to rewrite their financials because they had been misleading investors and the public about the threat to their own business plan and about the fact that they had very detailed analysis telling them how the price of coal would be going down in the face of actions taken by governments around the world.  But they were hiding it from their investors.  So they agreed to revise all of their filings with the SEC.    And the same week we announced that, we announced that we had served a subpoena on ExxonMobil pursuing that and other theories relating to consumer and securities fraud.  So we know, because of what's already out there in the public, that there are companies using the best climate science.  They are using the best climate models so that when they spend shareholder dollars to raise their oil rigs, which they are doing, they know how fast the sea level is rising.  Then they are drilling in places in the Arctic where they couldn't drill 20 years ago because of the ice sheets.  They know how fast the ice sheets are receding.  And yet they have told the public for years that there were no "competent models," was the specific term used by an Exxon executive not so long ago, no competent models to project climate patterns, including those in the Arctic.  And we know that they paid millions of dollars to support organizations that put out propaganda denying that we can predict or measure the effects of fossil fuel on our climate, or even denying that climate change was happening.

3

017-284890-16

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

There have been those who have raised the question:   aren't you interfering with people's First Amendment rights?   The First Amendment, ladies and gentlemen, does not give you the right to commit fraud.  And we are law enforcement officers, all of us do work, every attorney general does work on fraud cases.  And we are pursuing this as we would any other fraud matter.  You have to tell the truth.  You can't make misrepresentations of the kinds we've seen here.

And the scope of the problem we're facing, the size of the corporate entities and their alliances and trade associations and other groups is massive and it requires a multi-state effort.  So I am very honored that my colleagues are here today assembling with us.  We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action.  So today, we're sending a message that, at least some of us – actually a lot of us – in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.

And now I want to turn it over to my great colleague, the co-convener of this conference, Vermont Attorney General William Sorrel.

AG Sorrel:   I am pleased that the small state of Vermont joins with the big state of New York and are working together to make this gathering today a reality.   Truth is that states, large and small, have critical roles to play in addressing environmental quality issues.  General Schneiderman has mentioned our filing today in the D.C. Circuit on the Clean Power Plan case.  Going back some time, many of the states represented here joined with the federal government suing American Electric Power Company, the company operating several coal-fired electric plants in the Midwest and largely responsible for our acid rain and other air quality issues in the eastern part of the United States, ultimately resulting in what I believe to date is the largest settlement in an environmental case in our country's history.  With help from a number of these states, we successfully litigated Vermont's adoption of the so-called California standard for auto emissions in federal court in Vermont, now the standard in the country.  And right down to the present day, virtually all of the

4

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

states represented today are involved in looking at the alleged actions by Volkswagen and the issues relating to emissions from tens of thousands of their diesel automobiles.

But today we're talking about climate change which I don't think there's any doubt, at least in our ranks, is the environmental issue of our time. And in order for us to effectively address this issue, it's going to take literally millions of decisions and actions by countries, by states, by communities and by individuals. And, just very briefly, Vermont is stepping up and doing its part. Our legislature has set goals of 75% reduction – looking from a 1990 base line – a 75% reduction in greenhouse gas emissions by 2050. Similarly, our electric utilities have a goal of 75% use of renewable energy sources by 2032. So, we've been doing our part. Our presence here today is to pledge to continue to do our part. I'm mindful of the fact that I'm between you and the real rock star on this issue, and so I'm going to turn it back to General Schneiderman to introduce the next speaker.

**AG Schneiderman:**   Thank you. Thank you. I'm not really a rock star.

[Laughter]

Thank you Bill. It's always a pleasure to have someone here from a state whose U.S. senator is from Brooklyn.

[Laughter]

And doing pretty well for himself. So, Vice President Gore has a very busy schedule. He has been traveling internationally, raising the alarm but also training climate change activists. He rearranged his schedule so he could be here with us to day to meet with my colleagues and I. And there is no one who has done more for this cause, and it is a great pleasure to have him standing shoulder to shoulder with us as we embark on this new round in what we hope will be the beginning of the end of our addiction to fossil fuel and our degradation of the planet. Vice President Al Gore.

**VP Gore:**   Thank you very much, Eric. Thank you. Thank you very much.

[Applause]

Thank you very much, Attorney General Schneiderman. It really and truly is an honor for me to join you and your colleagues here,

017-284890-16

# AGs United For Clean Power Press Conference
## March 29, 2016: 11:35 am – 12:32 pm

Bill Sorrel of Vermont, Maura Healey of Massachusetts, Brian Frosh of Maryland, Mark Herring of Virginia, George Jepsen of Connecticut and Claude Walker from the U.S. Virgin Islands, and the ten (let's see 1, 2, 3, 4, 5) how many other – ten other states . . . eleven other state attorneys general offices that were represented in the meetings that took place earlier, prior to this press conference.

I really believe that years from now this convening by Attorney General Eric Schneiderman and his colleagues here today may well be looked back upon as a real turning point in the effort to hold to account those commercial interests that have been – according to the best available evidence – deceiving the American people, communicating in a fraudulent way, both about the reality of the climate crisis and the dangers it poses to all of us. And committing fraud in their communications about the viability of renewable energy and efficiency and energy storage that together are posing this great competitive challenge to the long reliance on carbon-based fuels. So, I congratulate you, Attorney General, and all of you, and to those attorneys general who were so impressively represented in the meetings here. This is really, really important.

I am a fan of what President Obama has been doing, particularly in his second term on the climate crisis. But it's important to recognize that in the federal system, the Congress has been sharply constraining the ability of the executive branch to fully perform its obligations under [the] Constitution to protect the American people against the kind of fraud that the evidence suggests is being committed by several of the fossil fuel companies, electric utilities, burning coal, and the like. So what these attorneys general are doing is exceptionally important. I remember very well – and I'm not going to dwell on this analogy – but I remember very well from my days in the House and Senate and the White House the long struggle against the fraudulent activities of the tobacco companies trying to keep Americans addicted to the deadly habit of smoking cigarettes and committing fraud to try to constantly hook each new generation of children to replenish their stock of customers who were dying off from smoking-related diseases. And it was a combined effort of the executive branch, and I'm proud that the Clinton-Gore administration played a role in that, but it was a combined effort in which the state attorneys general played the crucial role in securing an historic victory for public health. From the time the tobacco companies were first found out, as evidenced by the historic attorney generals' report of 1964, it

017-284890-16

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

took 40 years for them to be held to account under the law. We do not have 40 years to continue suffering the consequences of the fraud allegedly being committed by the fossil fuel companies where climate change is concerned.

In brief, there are only three questions left to be answered about the climate crisis. The first one is: Must we change, do we really have to change? We rely on fossil fuels for more than 80% of all the energy our world uses. In burning it we've reduced poverty and raised standards of living and built this elaborate global civilization, and it looks like it'll be hard to change. So naturally, people wonder: Do we really have to change? The scientific community has been all but unanimous for a long time now. But now mother nature and the laws of physics – harder to ignore than scientists – are making it abundantly clear that we have to change. We're putting 110 million tons of man-made heat trapping global warming pollution into the thin shell of atmosphere surrounding our planet every day, as if it's an open sewer. And the cumulative amount of that man-made global warming pollution now traps as much extra heat energy in the earth's system as would be released by 400,000 Hiroshima-class atomic bombs exploding every 24 hours on the surface of our planet.

It's a big planet, but that's a lot of energy. And it is the reason why temperatures are breaking records almost every year now. 2015 was the hottest year measured since instruments had been used to measure temperature. 14 of the 15 hottest have been in the last 15 years. As the Attorney General mentioned, February continues the trend by breaking all previous records – the hottest in 1,632 months ever measured. Last December 29th, the same unnatural global warming fuel storm system that created record floods in the Midwest went on up to the Arctic and on December 29th, smack in the middle of the polar winter night at the North Pole, temperatures were driven up 50 degrees above the freezing point. So the North Pole started thawing in the middle of the winter night. Yesterday the announcement came that it's the smallest winter extent of ice ever measured in the Arctic.

Ninety-three percent of the extra heat goes into the oceans of the world, and that has consequences. When Super Storm Sandy headed across the Atlantic toward this city, it crossed areas of the Atlantic that were nine degrees Fahrenheit warmer than normal

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

and that's what made that storm so devastating. The sea level had already come up because of the ice melting, principally off Greenland and Antarctica. And as the Attorney General mentioned, that's a process now accelerating. But these ocean-based storms are breaking records now. I just came from the Philippines where Super Typhoon Haiyon created 4 million homeless people when it crossed much warmer waters of the Pacific. By the way, it was a long plane flight to get here and I happened to get, just before we took off, the 200-page brief that you all filed in support of the Clean Power Plan. Really excellent work. Footnotes took up a lot of those 200 pages so I'm not claiming to [have] read all 200 of them.

The same extra heat in the oceans is disrupting the water cycle. We all learned in school that the water vapor comes off the oceans and falls as rain or snow over the land and then rushes back to the ocean. That natural life-giving process is being massively disrupted because the warmer oceans put a lot more water vapor up there. And when storm conditions present themselves they, these storms will reach out thousands of kilometers to funnel all that extra humidity and water vapor into these massive record-breaking downpours. And occasionally it creates a snowpocalypse or snowmaggedon but most often, record-breaking floods. We've had seven once-in-a-thousand-year floods in the last ten years in the U.S. Just last week in Louisiana and Arkansas, two feet of rain in four days coming again with what they call the Maya Express off the oceans. And the same extra heat that's creating these record-breaking floods also pull the soil moisture out of the land and create these longer and deeper droughts all around the world on every continent.

Every night on the news now it's like a nature hike through the Book of Revelation. And we're seeing tropical diseases moving to higher latitudes – the Zika virus. Of course the transportation revolution has a lot to do with the spread of Zika and Dengue Fever and Chikungunya and diseases I've never heard of when I was growing up and maybe, probably most of you never did either. But now, they're moving and taking root in the United States. Puerto Rico is part of the United States, by the way – not a state, but part of our nation. Fifty percent of the people in Puerto Rico are estimated to get the Zika virus this year. By next year, eighty percent. When people who are part of the U.S. territory, when women are advised not to get pregnant, that's something new that

8

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

ought to capture our attention. And in large areas of Central America and South America, women are advised now not to get pregnant for two years until they try to get this brand new viral disease under control.

The list of the consequences continues, and I'm not going to go through it all, but the answer to that first question: "Do we have to change?" is clearly now to any reasonable thinking person: "yes, we have to change." Now the second question is: "Can we change?" And for quite a few years, I will confess to you that, when I answered that question yes, it was based on the projections of scientists and technologists who said, just wait. We're seeing these exponential curves just begin, solar is going to win, wind power is going to get way cheaper, batteries are going to have their day, we're going to see much better efficiency. Well now we're seeing these exponential curves really shoot up dramatically. Almost 75% of all the new investment in the U.S. in new generating capacity last year was in solar and wind – more than half worldwide. We're seeing coal companies go bankrupt on a regular basis now. Australia is the biggest coal exporter in the world. They've just, just the analysis there, they're not going to build any more coal plants because solar and wind are so cheap. And we're seeing this happen all around the world. But, there is an effort in the U.S. to slow this down and to bring it to a halt because part of the group that, again according to the best available evidence, has been committing fraud in trying to convince people that the climate crisis is not real, are now trying to convince people that renewable energy is not a viable option. And, worse than that, they're using their combined political and lobbying efforts to put taxes on solar panels and jigger with the laws to require that installers have to know the serial number of every single part that they're using to put on a rooftop of somebody's house, and a whole series of other phony requirements, unneeded requirements, that are simply for the purpose of trying to slow down this renewable revolution. In the opinion of many who have looked at this pattern of misbehavior and what certainly looks like fraud, they are violating the law. If the Congress would actually work – our democracy's been hacked, and that's another story, not the subject of this press conference – but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level. But these brave men and women, who are the attorneys general of the states represented in this historic coalition, are doing their job and – just

9

017-284890-16

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

as many of them did in the tobacco example – they are now giving us real hope that the answer to that third question: "Will we change?" is going to be "yes." Because those who are using unfair and illegal means to try to prevent the change are likely now, finally, at long last, to be held to account. And that will remove the last barriers to allow the American people to move forward and to redeem the promise of our president and our country in the historic meeting in Paris last December where the United States led the global coalition to form the first global agreement that is truly comprehensive. If the United States were to falter and stop leading the way, then there would be no other leader for the global effort to solve this crisis. By taking the action these attorneys general are taking today, it is the best, most hopeful step I can remember in a long time – that we will make the changes that are necessary.

So, I'll conclude my part in this by, once again, saying congratulations to these public servants for the historic step they are taking today. And on behalf of many people, who I think would say it's alright for me to speak for them, I'd like to say thank you.

AG Schneiderman:   Thank you very much, and now my other colleagues are going to say a few words. For whatever reason, I've gotten into the habit, since we always seem to do this, we do this in alphabetical order by state, which I learned when I first became an AG but I guess we'll stick with it. Connecticut Attorney General George Jepsen who was our partner in the *Friedrichs* case and stood with me when we announced that we were filing in that case. We've done a lot of good work together. Attorney General Jepsen.

AG Jepsen:   I'd like to thank Eric and Bill for their leadership on this important issue and in convening this conference and to recognize the man who has done more to make global warming an international issue than anybody on the entire planet – Vice President Al Gore. In the backdrop, in the backdrop of a very dysfunctional Congress, state attorneys general, frequently on a bipartisan, basis have shown that we can stand up and take action where others have not. The Vice President referenced the tobacco litigation, which was before my time but hugely important in setting the tone and the structures by which we do work together. Since becoming attorney general in 2011, we've taken on the big banks and their mortgage servicing issues, a $25 billion settlement. We've taken on Wall Street's Standard & Poor's for mislabeling mortgage-backed securities – as

10

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

a 20-state coalition – mislabeling mortgage-backed securities as AAA when in fact they were junk. Working together on data privacy issues, and now it's time that we stand up once again and take on what is the most important issue of our generation. We owe it to our children, our children's children, to step up and do the right thing, to work together and I'm committed to it. Thank you.

**AG Schneiderman:** Thank you. And now a relatively new colleague but someone who has brought incredible energy to this fight and who we look forward to working with on this and other matters for a long time to come. Maryland Attorney General Brian Frosh.

**AG Frosh:** Well, first thank you again to General Schneiderman and General Sorrel for putting together this group and it's an honor to be with you, Mr. Vice President. Thank you so much for your leadership. I'm afraid we may have reached that point in the press conference where everything that needs to be said has been said, but everyone who needs to say it hasn't said it yet.

[Laughter]

So, I will try to be brief. Climate change is an existential threat to everybody on the planet. Maryland is exceptionally vulnerable to it. The Chesapeake Bay bisects our state. It defines us geographically, culturally, historically. We have as much tidal shoreline as states as large as California. We have islands in the Chesapeake Bay that are disappearing. We have our capital, Annapolis, which is also the nuisance flood capital of the United States. It's under water way, way, way too often. It's extraordinarily important that we address the problem of climate change. I'm grateful to General Sorrel and General Schneiderman for putting together this coalition of the willing. I'm proud to be a part of it in addressing and supporting the President's Clean Power Plan. What we want from ExxonMobil and Peabody and ALEC is very simple. We want them to tell the truth. We want them to tell the truth so that we can get down to the business of stopping climate change and of healing the world. I think that as attorneys general, as the Vice President said, we have a unique ability to help bring that about and I'm very glad to be part of it.

**AG Schneiderman:** Thank you. And, another great colleague, who has done extraordinary work before and since becoming attorney general working with our office on incredibly important civil rights issues,

11

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

financial fraud issues, Massachusetts Attorney General Maura Healey.

**AG Healey:**   Thank you very much General Schneiderman. Thank you General Schneiderman and General Sorrel for your leadership on this issue. It's an honor for me to be able to stand here today with you, with our colleagues and certainly with the Vice President who, today, I think, put most eloquently just how important this is, this commitment that we make. Thank you for your leadership. Thank you for your continuing education. Thank you for your inspiration and your affirmation.

You know, as attorneys general, we have a lot on our plates: addressing the epidemics of opiate abuse, gun violence, protecting the economic security and well-being of families across this country; all of these issues are so important. But make no mistake about it, in my view, there's nothing we need to worry about more than climate change. It's incredibly serious when you think about the human and the economic consequences and indeed the fact that this threatens the very existence of our planet. Nothing is more important. Not only must we act, we have a moral obligation to act. That is why we are here today.

The science – we do believe in science; we're lawyers, we believe in facts, we believe in information, and as was said, this is about facts and information and transparency. We know from the science and we know from experience the very real consequences of our failure to address this issue. Climate change is and has been for many years a matter of extreme urgency, but, unfortunately, it is only recently that this problem has begun to be met with equally urgent action. Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts. Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable. That's why I, too, have joined in investigating the practices of ExxonMobil. We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public.

12

017-284890-16

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

We are here before you, all committed to combating climate change and to holding accountable those who have misled the public. The states represented here today have long been working hard to sound the alarm, to put smart policies in place, to speed our transition to a clean energy future, and to stop power plants from emitting millions of tons of dangerous global warming pollution into our air. I will tell you, in Massachusetts that's been a very good thing. Our economy has grown while we've reduced greenhouse gas emissions and boosted clean power and efficiency. We're home to a state with an $11 billion clean energy industry that employs nearly 100,000 people. Last year clean energy accounted for 15% of New England's power production. Our energy efficiency programs have delivered $12.5 billion in benefits since 2008 and are expected to provide another $8 billion over the next three years. For the past five years, Massachusetts has also been ranked number one in the country for energy efficiency. So we know what's possible. We know what progress looks like. But none of us can do it alone. That's why we're here today. We have much work to do, but when we act and we act together, we know we can accomplish much. By quick, aggressive action, educating the public, holding accountable those who have needed to be held accountable for far too long, I know we will do what we need to do to address climate change and to work for a better future. So, I thank AG Schneiderman for gathering us here today and for my fellow attorneys general in their continued effort in this important fight. Thank you.

**AG Schneiderman:** Thank you. And now another great colleague who speaks as eloquently as anyone I've heard about what's happening to his state, and a true hero of standing up in a place where maybe it's not quite as politically easy as it is to do it in Manhattan but someone who is a true aggressive progressive and a great attorney general, Mark Herring from Virginia.

**AG Herring:** Thank you, Eric. Good afternoon. In Virginia, climate change isn't some theoretical issue. It's real and we are already dealing with its consequences. Hampton Roads, which is a coastal region in Virginia, is our second most populated region, our second biggest economy and the country's second most vulnerable area as sea levels rise. The area has the tenth most valuable assets in the world threatened by sea level rise. In the last 85 years the relative sea level in Hampton Roads has risen 14 inches – that's well over a foot – in just the last century.

13

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

Some projections say that we can expect an additional two to five feet of relative sea level rise by the end of this century – and that would literally change the face of our state. It would cripple our economy and it could threaten our national security as Norfolk Naval, the world's largest naval base, is impacted. Nuisance flooding that has increased in frequency will become the norm. They call it blue sky flooding. Storm surges from tropical systems will threaten more homes, businesses and residents. And even away from the coast, Virginians are expected to feel the impact of climate change as severe weather becomes more dangerous and frequent. Just a few weeks ago, we had a highly unusual February outbreak of tornadoes in the Commonwealth that was very damaging and unfortunately deadly.

Farming and forestry is our number one industry in Virginia. It's a $70 billion industry in Virginia that supports around 400,000 jobs and it's going to get more difficult and expensive. And, the Commonwealth of Virginia local governments and the navy are already spending millions to build more resilient infrastructure, with millions and millions more on the horizon. To replace just one pier at Norfolk Naval is about $35 to $40 million, and there are 14 piers, so that would be around a half billion right there.

As a Commonwealth and a nation, we can't put our heads in the sand. We must act and that is what today is about. I am proud to have Virginia included in this first of its kind coalition which recognizes the reality and the pressing threat of man-made climate change and sea level rise. This group is already standing together to defend the Clean Power Plan – an ambitious and achievable plan – to enjoy the health, economic and environmental benefits of cleaner air and cleaner energy. But there may be other opportunities and that's why I have come all the way from Virginia. I am looking forward to exploring ideas and opportunities, to partner and collaborate, if there are enforcement actions we need to be taking, if there are legal cases we need to be involved in, if there are statutory or regulatory barriers to growing our clean energy sectors and, ultimately, I want to work together with my colleagues here and back in Virginia to help combat climate change and to shape a more sustainable future.

And for any folks who would say the climate change is some sort of made-up global conspiracy, that we're wasting our time, then

14

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

come to Hampton Roads. Come to Norfolk and take a look for yourselves. Mayor Fraim would love to have you.

**AG Schneiderman:** Thank you. And our closer, another great colleague who has traveled far but comes with tremendous energy to this cause and is an inspiration to us all, U.S. Virgin Islands Attorney General Claude Walker.

**AG Walker:** Thank you. Thank you, General Schneiderman, Vice President Gore. One of my heroes, I must say. Thank you. I've come far to New York to be a part of this because in the Virgin Islands and Puerto Rico, we experience the effects of global warming. We see an increase in coral bleaching, we have seaweeds, proliferation of seaweeds in the water, all due to global warming. We have tourism as our main industry, and one of the concerns that we have is that tourists will begin to see this as an issue and not visit our shores. But also, residents of the Virgin Islands are starting to make decisions about whether to live in the Virgin Islands – people who have lived there for generations, their families have lived there for generations. We have a hurricane season that starts in June and it goes until November. And it's incredibly destructive to have to go through hurricanes, tropical storms annually. So people make a decision: Do I want to put up with this, with the power lines coming down, buildings being toppled, having to rebuild annually? The strengths of the storms have increased over the years. Tropical storms now transform into hurricanes. When initially they were viewed as tropical storms but as they get close to the land, the strength increases. So we're starting to see people make decisions about whether to stay in a particular place, whether to move to higher ground – which is what some have said – as you experience flooding, as you experience these strong storms. So we have a strong stake in this, in making sure that we address this issue.

We have launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it. And we'll make our decision about what action to take. But, to us, it's not an environmental issue as much as it is about survival, as Vice President Gore has stated. We try as attorneys general to build a community, a safe community for all. But what good is that if annually everything is destroyed and people begin to say: Why am I living here?

15

017-284890-16

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

So we're here today to support this cause and we'll continue. It could be David and Goliath, the Virgin Islands against a huge corporation, but we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational. We cannot continue to rely on fossil fuel. Vice President Gore has made that clear. We have to look at renewable energy. That's the only solution. And it's troubling that as the polar caps melt, you have companies that are looking at that as an opportunity to go and drill, to go and get more oil. Why? How selfish can you be? Your product is destroying this earth and your strategy is, let's get to the polar caps first so we can get more oil to do what? To destroy the planet further? And we have documents showing that. So this is very troubling to us and we will continue our fight. Thank you.

**AG Schneiderman:** Thank you and Eric. And I do want to note, scripture reports David was not alone in fact, Brother Walker. Eric and Matt will take on-topic questions.

**Moderator:** Please just say your name and publication.

**Press Person:** John [inaudible] with *The New York Times*. I count two people who have actually said that they're launching new investigations. I'm wondering if we could go through the list and see who's actually in and who is not in yet.

**AG Schneiderman:** Well, I know that prior to today, it was, and not every investigation gets announced at the outset as you know, but it had already been announced that New York and California had begun investigations with those stories. I think Maura just indicated a Massachusetts investigation and the Virgin Islands has, and we're meeting with our colleagues to go over a variety of things. And the meeting goes on into the afternoon. So, I am not sure exactly where everyone is. Different states have – it's very important to understand – different states have different statutes, different jurisdictions. Some can proceed under consumer protection law, some securities fraud laws, there are other issues related to defending taxpayers and pension funds. So there are a variety of theories that we're talking about and collaborating and to the degree to which we can cooperate, we share a common interest, and we will. But, one problem for journalists with investigations is, part of doing an investigation is you usually don't talk a lot about what you're doing after you start it or even as you're preparing to start it.

16

017-284890-16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

| | |
|---|---|
| **Press Person:** | [inaudible] with *InsideClimate News*. Along the lines of talking about that analogy: from a legal framework, can you talk about a comparison, similarities and differences between this potential case and that of Big Tobacco? |
| **AG Schneiderman:** | Well, again, we're at the early stages of the case. We are not pre-judging the evidence. We've seen some things that have been published by you and others, but it is our obligation to take a look at the underlying documentation and to get at all the evidence, and we do that in the context of an investigation where we will not be talking about every document we uncover. It's going to take some time, but that's another reason why working together collectively is so important. And we are here today because we are all committed to pursuing what you might call an all-levers approach. Every state has different laws, different statutes, different ways of going about this. The bottom line is simple. Climate change is real, it is a threat to all the people we represent. If there are companies, whether they are utilities or they are fossil fuel companies, committing fraud in an effort to maximize their short-term profits at the expense of the people we represent, we want to find out about it. We want to expose it, and we want to pursue them to the fullest extent of the law. |
| **Moderator:** | Last one. |
| **Press Person:** | Storms, floods will arise they are all going to continue to destroy property and the taxpayers . . . |
| **Moderator:** | What's your name and . . . |
| **Press Person:** | Oh, sorry. Matthew Horowitz from *Vice*. Taxpayers are going to have to pay for these damages from our national flood insurance claims. So if fossil fuel companies are proven to have committed fraud, will they be held financially responsible for any sorts of damages? |
| **AG Schneiderman:** | Again, it's early to say but certainly financial damages are one important aspect of this but, and it is tremendously important and taxpayers – it's been discussed by my colleagues – we're already paying billions and billions of dollars to deal with the consequences of climate change and that will be one aspect of – early foreseeing, it's far too early to say. But, this is not a situation where financial damages alone can deal with the problem. We have to change conduct, and as the Vice President indicated, other |

19

017-284890-16

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

places in the world are moving more rapidly towards renewables. There is an effort to slow that process down in the United States. We have to get back on that path if we're going to save the planet and that's ultimately what we're here for.

**Moderator:**      We're out of time, unfortunately.  Thank you all for coming.